*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. YOUNG, Minor.

UNPUBLISHED
January 17, 2025
9:34 AM

No. 370649
Lenawee Circuit Court
Family Division
LC No. 22-000222-NA

Before: GADOLA, C.J., and RICK and MARIANI, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights to her minor child, CY, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

In November 2022, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court take jurisdiction over CY and remove him from respondent's care. DHHS alleged that respondent lacked suitable housing and was providing improper supervision for CY. DHHS alleged that, after CY had been removed from his father's care due to allegations that the father had sexually abused two minor children,[1] respondent agreed to multiple safety plans for CY's care but had willfully ignored and violated those safety plans. In particular, respondent had permitted unsupervised contact between CY and his father, had continued to reside with CY's father despite agreeing to reside with her sister following CY's removal from his father's care, and

---

[1] These child protective proceedings initially began in October 2022 when DHHS filed a petition to terminate the parental rights of CY's father to CY at initial disposition, alleging that CY's father sexually abused two minor children, but respondent was not named a respondent in the proceedings until DHHS filed a petition against her in November 2022. CY's father voluntarily relinquished his parental rights to CY in February 2024 and is not involved in this appeal.

had permitted unsupervised contact between CY and respondent's friend despite the friend's involvement with Children's Protective Services (CPS) for her abuse of her own child. DHHS also alleged that respondent maintained that CY did not need protection from CY's father because even if the sexual-abuse allegations against him were true, unsupervised contact between CY and his father did not present any risk of harm to CY. Following a preliminary hearing, the trial court authorized the petition, removed CY from respondent's care and placed him with a relative (the mother of CY's two older half-brothers),[2] and granted respondent supervised parenting time.

The trial court conducted an adjudication hearing in January 2023, and respondent pleaded no contest to the allegations in the petition and to the court's exercise of jurisdiction under MCL 712A.2(b)(1) (reason to believe child at substantial risk of harm) and (b)(2) (unfitness of parental home). As a factual basis for the plea, the court relied on prior testimony from a CPS investigator, CY's relative placement, and respondent, all of which was provided at the preliminary hearing and further addressed the allegations in the petition. The trial court accepted respondent's pleas, exercised jurisdiction, continued respondent's supervised parenting time, and ordered DHHS to engage in reasonable efforts toward reunification. DHHS created a case service plan, which the trial court adopted. The court ordered respondent to comply with her case service plan and participate in and benefit from mental-health and parenting-education services. The court also ordered respondent to complete a psychological evaluation and follow all recommendations from that evaluation, obtain and maintain suitable housing and a legal source of income, refrain from contact with individuals with a criminal or central-registry history in her home, and consistently participate in parenting time.

Respondent struggled to progress on her case service plan. Respondent's housing was unstable throughout the case; respondent frequently moved between Adrian, Michigan, and Toledo, Ohio, and she was often homeless in both locations. Respondent's frequent moves made it very difficult for DHHS to locate and refer services for respondent, but even when DHHS provided referrals for mental-health and parenting-education services in Toledo, respondent did not attend them. Respondent's frequent moves and unreliable transportation also affected her parenting time with CY; although respondent communicated with CY via phone and video calls on a fairly regular basis, she only attended approximately 25% of her scheduled in-person parenting times. Despite indicating that it was difficult for her to attend services when she was traveling between Michigan and Ohio, respondent declined DHHS's assistance with relocation to Lenawee County so that she could be closer to CY for in-person visits and have easier access to readily-available services.

In January 2024, DHHS—at the trial court's direction—filed a supplemental petition requesting termination of respondent's parental rights under MCL 712A.19b(3)(c)(i) and (j).[3] At the termination hearing in April 2024, respondent's caseworker testified that DHHS provided

_____

[2] The mother of CY's two half-brothers constituted a "relative" in this context because she was a "parent who shares custody of a half-sibling[.]" MCL 712A.13a(1)(j)(i).

[3] DHHS also requested termination under MCL 712A.19b(3)(g) (failure to provide proper care and custody), but as made clear by the parties' and the trial court's statements at the termination hearing, the court did not find sufficient grounds for termination under subsection (g) in this case.

-2-

numerous services to respondent, but respondent failed to participate in the services, and mental health, housing, employment, and parenting skills all remained barriers to reunification. The caseworker testified that respondent had been noncompliant with her case service plan throughout the entire case, noting that respondent provided "no verification of engagement in any services, no verification of stable housing, [and] no verification of employment" and had "sporadic and inconsistent contact with and visitation with" CY. The caseworker emphasized that for "all of the services that were required at the outset of the case[,] none of them have been engaged in, completed, and no benefit has been shown." Respondent also repeatedly refused to meet or communicate with her caseworker about her services throughout the case.

Regarding respondent's mental health, DHHS repeatedly referred respondent for individual counseling throughout the case, including while respondent resided in Toledo, but respondent never engaged with those services. Respondent also never completed her psychological evaluation, cancelling one scheduled appointment and failing to appear for the other. Respondent voluntarily admitted herself into an inpatient mental-health and substance-abuse treatment facility in September 2023 to address her self-reported substance abuse, but she was released from the program four days later for violating the facility's rules, and she never "engaged in any follow up substance abuse services since then." Respondent attended a follow-up case management meeting, but she failed to attend her follow-up psychiatric appointment at Community Mental Health (CMH), and CMH eventually closed her case for failure to participate. Respondent reported to her caseworker that she "more recently" attempted to reengage in services at CMH, but she was unable to do so because she no longer qualified for the services. DHHS thereafter referred respondent to another program for mental-health services, but DHHS never received verification that respondent had ever "contacted them or started services" there.

Regarding respondent's housing and employment, respondent reported that she obtained housing approximately one month before the termination hearing, but she never provided any documentation to verify that she lived there, and the caseworker was never able to complete an assessment of the home to verify that it was appropriate for CY to live in. Additionally, respondent indicated that she obtained her housing through her romantic partner, who was incarcerated, and it was unclear what would happen to respondent's housing upon her partner's release from incarceration because the home actually belonged to her partner's father. The caseworker also testified that she was unsure whether respondent actually had access to the home that she claimed to be living in because, when she dropped respondent off at the home a few weeks before the termination hearing, she saw respondent enter the home by "open[ing] a window and crawl[ing] in[.]" Respondent was unemployed throughout most of the case and asked CY's relative placement for money on several occasions. Although respondent reported that she had obtained part-time employment at McDonald's approximately one week before the termination hearing, she never provided any documentation to verify that she worked there.

Regarding respondent's parenting skills, DHHS referred respondent for parenting education services in both Michigan and Ohio, but respondent did not engage in the services until shortly before the termination hearing. Although respondent spoke to CY on the phone on a fairly consistent basis, she had a "tendency" throughout the case "to reach out to [CY's placement] not only to speak to the child . . . but also to get emotional support from the [placement] and to ask for financial help." Additionally, although respondent generally behaved appropriately when she attended parenting-time visits in person, respondent attended less than 25% of the offered

parenting-time visits.[4]  Given the regular communication between CY's relative placement and respondent, CY's relative placement offered respondent great flexibility with parenting-time visits, but respondent never rescheduled or set up additional visits with CY.  Respondent also occasionally brought CY gifts or food to prepare a meal for him at the placement's home during an in-person visit, but she did not consistently provide for CY's material needs or provide any financial support for necessities such as clothing, shoes, and school supplies, and she asked CY's placement for money on several occasions.

At the close of proofs, the trial court found that DHHS had established grounds for termination under MCL 712A.19b(3)(c)(*i*) and (j) by clear and convincing evidence.  The court found that mental health, employment, housing, and parenting skills all remained barriers to reunification and that there was no reasonable likelihood that respondent would rectify those conditions within a reasonable time considering CY's young age.  The court found that respondent had intermittently been able to obtain housing and employment but had not shown either to be stable.  The court observed that, throughout the proceedings, respondent had been relying on CY's placement for "emotional and financial support" and was "still at a place where she has to prioritize her own needs over her child's needs."  The court also noted respondent's failure to comply with various aspects of her case service plan, including failing to complete a psychological evaluation and participate in mental-health and parenting-education services.  The court emphasized that it had been 16 months since the start of this case and that, while respondent had shown some recent signs of progress, respondent would still need at least an additional six months to demonstrate to the court that the progress was lasting and that she was "gainfully employed, steadily housed, ha[d] appropriate housing" for CY, knew what CY's needs were, and knew how to adequately take care of CY's needs.  Given the amount of time that respondent had already had at that point, as well as CY's young age, the fact that for "approximately one third of his life he has been flux," and his immediate need for stability and permanency, the court found it was unreasonable "to wait six months to a year to see if this particular stage of stability for [respondent] is one that she can maintain."  The trial court also found that CY faced a reasonable likelihood of harm if returned to respondent for the same reasons already mentioned as well as respondent's continued drug use.

The trial court next found that, for many of the same reasons, DHHS had established by a preponderance of the evidence that termination was in CY's best interests.  The court emphasized that given CY's young age and the fact that he had been in his relative placement for approximately one third of his young life, CY needed stability and permanency, and respondent had not demonstrated that she could provide for those needs.  The court also emphasized that CY was "very bonded" with his relative placement and his two brothers, was "doing excellent" in his placement, and had "thrived since he ha[d] been in that home."  The court also noted that CY had expressed that he wanted to remain with his relative placement and that there was "a very high likelihood of [CY] being adopted" by his relative placement.  The court considered CY's relative placement but found that termination was still in his best interests because there were still

---

[4] Respondent's parenting-time participation rate had dropped below 25% by the time of the termination hearing because respondent had only attended one in-person visit during the three months between when DHHS filed a court report in January 2024 and when the hearing occurred in April 2024.

"significant concerns" regarding respondent's ability to adequately care for CY and the safety and stability of respondent's living situation. The trial court thereafter issued an order terminating respondent's parental rights to CY. This appeal followed.

## II. STANDARD OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence and that termination is in a child's best interests. *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 4. A finding is clearly erroneous if, even if some evidence supports the finding, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id.* "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court gives deference to "the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted).

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court clearly erred by finding that clear and convincing evidence supported termination of her parental rights under MCL 712A.19b(3)(c)(*i*) and (j). We disagree.

A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds by clear and convincing evidence that "after 182 days have elapsed, the conditions resulting in adjudication remain present and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 4 (quotation marks and citation omitted). This Court has upheld termination under this subsection when "the totality of the evidence amply supports that [the respondent] had not accomplished any meaningful change in the conditions" that led to the adjudication, *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009), and would not be able to rectify those conditions "within a reasonable time considering the child's age," MCL 712A.19b(3)(c)(*i*). What constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the child can wait for the improvements to occur. See *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). "Even if conditions improved in the months before the termination hearing, a trial court may look to the totality of the evidence to determine whether a parent accomplished meaningful change in the conditions that led to adjudication." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022).

In this case, there is no question that more than 182 days elapsed between the issuance of the initial dispositional order in February 2023 and the issuance of the termination order in April 2024. The conditions that led to adjudication were primarily respondent's mental-health issues, parenting skills, and unstable housing and employment. Based on the totality of the evidence before the trial court at the time of termination, we see no reversible error in the court's conclusion

that these conditions continued to exist and that there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering CY's age.

As summarized previously, ample evidence supported the trial court's findings that respondent had failed to adequately rectify her mental-health issues, parenting skills, and unstable housing and employment. DHHS referred respondent to multiple different mental-health services in Michigan and Ohio, but respondent never engaged with those services until immediately before the termination hearing. Even then, however, respondent had only just signed up for counseling and had not yet participated in any sessions. Respondent also never completed her mandatory psychological evaluation and was dismissed from a mental-health and substance-abuse treatment facility for violating the facility's rules four days after she had voluntarily admitted herself to the facility. Respondent also did not participate in any parenting-education services, despite referrals in multiple locations, until immediately before the termination hearing and had yet to complete the program. Respondent was homeless and unemployed throughout much of the case, and although respondent reported that she had obtained housing and a job shortly before the termination hearing, she never provided her caseworker with any documentation to verify either. The caseworker was also never able to complete an assessment of the home to verify that it was safe and appropriate for CY. Additionally, the caseworker was unsure whether respondent was actually permitted to reside in the house because, although respondent reported that she could continue to live there while her partner was incarcerated, the caseworker saw respondent gain access to the house by crawling through a window. Respondent also made little effort to engage in scheduled parenting times with CY, having only attended less than 25% of the offered visits. Respondent indicated that it was difficult for her to engage in services when she was traveling between Michigan and Ohio, but respondent refused DHHS's assistance with relocation to Lenawee County, which would have allowed her to be closer to CY and have easier access to readily-available services.

The record also amply supported the trial court's finding that there was no reasonable likelihood that respondent would rectify these conditions within a reasonable time considering CY's age. See MCL 712A.19b(3)(c)(*i*). The caseworker testified that respondent was largely noncompliant with the case service plan for approximately 16 months. Respondent was offered numerous services to enable her to reunite with CY during these 16 months, but she did not engage in any services until a few weeks prior to the termination hearing and failed to demonstrate benefit from any of the services. Although respondent reported that she had obtained part-time employment and stable housing and had begun parenting-education and mental-health services by the time of the termination hearing, she did not do so until only a few weeks before the termination hearing, and she did not provide any sort of documentation through which her caseworker could verify any of these things. Given respondent's lack of participation in her services during the 16-month pendency of this case, respondent's caseworker did not believe that respondent would consistently participate in services and rectify her barriers if given additional time.

Respondent stresses that she was making progress by the time of the termination hearing. As noted, however, "[e]ven if conditions improved in the months before the termination hearing, a trial court may look to the totality of the evidence to determine whether a parent accomplished meaningful change in the conditions that led to adjudication." *Jackisch/Stamm-Jackisch*, 340 Mich App at 334. Here, the totality of the record before the trial court at the time of termination provided ample basis for the court to conclude that, despite any recent improvements respondent may have made in certain respects, clear and convincing evidence demonstrated she had not

"accomplished meaningful change in the conditions that led to adjudication" and there was no reasonable likelihood that she would rectify those conditions within a reasonable time given CY's young age. *Id.*; MCL 712A.19b(3)(c)(*i*). Respondent has failed to show that the trial court reversibly erred in reaching this conclusion.[5]

## IV. BEST INTERESTS

Respondent also argues that the trial court erred by finding that termination was in CY's best interests. We disagree.

When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the children's best interests," and it should consider a variety of factors when making its determination. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citation omitted). Such factors include

> the child's bond to the parent, the parent's parenting ability, and the child's need for permanency, stability, and finality. Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, and a parent's substance-abuse history. The court may also consider whether the parent can provide a permanent, safe, and stable home. Additionally, the court may consider the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child's well-being while in care, and the possibility of adoption. [*MJC*, ___ Mich App at ___; slip op at 9-10 (quotation marks, citations, and alteration omitted).]

"The trial court may also consider how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all." *In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020) (quotation marks, citation, and alteration omitted). "[A] child's placement with relatives is a factor that the trial court is required to consider when making its best-interests determination, and a child's placement with relatives weighs against termination." *Id.* (quotation marks and citations omitted).

Respondent argues that the trial court gave inadequate weight to the fact that she was "proactive at the beginning and end of the case." As previously discussed, however, ample evidence supported the trial court's conclusion that respondent had not accomplished meaningful change in the conditions that led to adjudication, including mental health, parenting skills, and unstable housing and employment. See *MJC*, ___ Mich App at ___; slip op at 10; *Jackisch/Stamm-Jackisch*, 340 Mich App at 334. Respondent also argues that the trial court gave inadequate weight to the fact that she was bonded with CY, maintained communication with CY via phone and video calls, and did not display abusive or neglectful behavior during in-person parenting times.

---

[5] Because only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, we need not address respondent's arguments regarding MCL 712A.19b(3)(j). See *Jackisch/Stamm-Jackisch*, 340 Mich App at 333-334.

Respondent, however, did not consistently attend in-person visits and attended less than 25% of her offered visits throughout the case. Additionally, although respondent regularly communicated with CY over the phone and generally acted appropriately during in-person visits, the caseworker testified that there were still "observable concerns" regarding the bond between CY and respondent. In particular, the caseworker noted that respondent's interactions with CY typically centered around herself, that respondent was unaware of important matters regarding CY's schooling even though he had attended the same school since before the case began, and that CY "ran to [the caseworker] and hugged [her but] did not do the same" with respondent. Conversely, CY had a very strong bond with his two brothers and his relative placement, who had cared for CY throughout the entire case and had expressed interest in adoption. The caseworker also testified that although CY did not call his relative placement "mother or mom" when he spoke directly to her, CY always referred to his placement "as mom when talking to his friends, neighbors and peers." CY was thriving in his relative placement and had expressed a desire to remain in her home, and CY's relative placement indicated that she intended to maintain a relationship between respondent and CY even after termination.

The court found—and the record supports—that even though CY was placed with a relative, termination was still in his best interests because respondent could not provide CY with the stability and permanence that he needed in his young life, but CY's relative placement could provide—and had provided—for those needs. The record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *White*, 303 Mich App at 713, and we see no clear error in its findings, see *Lombard*, ___ Mich App at ___; slip op at 5-6.

Affirmed.

/s/ Michael F. Gadola
/s/ Michelle M. Rick
/s/ Philip P. Mariani